```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
Neil Raymond,

                          Plaintiff,                              MEMORANDUM & ORDER
                                                                  21-CV-06897 (DG) (RML)
       -against-

The City of New York,

                          Defendant.
---------------------------------------------------------------X
```

DIANE GUJARATI, United States District Judge:

On December 14, 2021, Plaintiff Neil Raymond commenced this action against Defendant City of New York, stemming from his requests to make a mural "recognizing that lives other than black lives matter" and Defendant's denial of his requests. *See generally* ECF No. 1. On February 6, 2023, Plaintiff filed the Amended Complaint. *See* Amended Complaint ("Am. Compl."), ECF No. 16.

Plaintiff's Amended Complaint asserts two causes of action: (1) Violation of the First Amendment of the U.S. Constitution as Applied Through 42 U.S.C. § 1983 (the "First Amendment claim"); and (2) Violation of the New York State Constitution, Article 1, Section 8 (the "state law claim"). *See* Am. Compl. ¶¶ 36-42. Plaintiff alleges that he spent hundreds of dollars on materials and has suffered emotional distress, loss of confidence and purpose, loss of respect among his peers, and other damages. *See* Am. Compl. ¶¶ 33-34. Plaintiff seeks a declaration that Defendant has violated Plaintiff's rights under the New York State Constitution and under the First Amendment, an order requiring Defendant to allow Plaintiff to present his chosen message in an appropriate public venue within the City of New York, financial damages, compensatory damages, and legal fees and costs. *See* Am. Compl. at 8-9.

Pending before the Court is Defendant's Motion to Dismiss the Amended Complaint

pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "Motion to Dismiss"). *See* Notice of Motion to Dismiss, ECF No. 24; *see also* Declaration in Support of Motion to Dismiss ("Murray Declaration"), ECF No. 25; [1] Memorandum of Law in Support of Motion to Dismiss ("Def.'s Br."), ECF No. 26; Reply Memorandum of Law in Further Support of Motion to Dismiss ("Def.'s Reply"), ECF No. 28. Plaintiff opposes the Motion to Dismiss. *See* Plaintiff's Memorandum of Law in Opposition to Motion to Dismiss ("Pl.'s Br."), ECF No. 27.

For the reasons set forth below, Defendant's Motion to Dismiss is granted and the Amended Complaint is dismissed in its entirety.

## BACKGROUND

### I. Factual Background[2]

Plaintiff alleges that Black Lives Matter ("BLM") is a political movement that started in 2013 and became extremely popular in 2020. *See* Am. Compl. ¶ 12. Plaintiff alleges that "Bill DiBlasio, the mayor of New York City from 2014 through 2021, has been especially supportive of BLM," "stated that BLM is an issue 'beyond politics,'" and "promised that each borough would receive a BLM mural." *See* Am. Compl. ¶¶ 13, 15.[3] Plaintiff alleges that, "on July 9,

---

[1] Together with the Murray Declaration, ECF No. 25, Defendant submitted seventeen exhibits, *see* ECF Nos. 25-1–25-3. In referring to these exhibits, the Court uses the letters assigned to the exhibits in the Murray Declaration. In citing to these exhibits, the Court refers to the pagination generated by the Court's electronic case filing system ("ECF"), rather than to the exhibits' internal pagination. All other citations are to the cited document's internal pagination.

[2] The following facts, which are viewed in the light most favorable to Plaintiff, are drawn from the Amended Complaint and from certain documents incorporated by reference in the Amended Complaint or integral to the Amended Complaint, as to which there is no dispute regarding authenticity, accuracy, or relevance.

[3] Where quoting from the Amended Complaint, the Court retains Plaintiff's spelling. The Court, however, notes that Plaintiff misspells, *inter alia*, former Mayor Bill de Blasio's surname.

2

2020, the City of New York, led by DiBlasio, painted the words 'Black Live Matters' outside Trump Tower" and alleges that "the words 'Black Lives Matter' were painted in large, yellow letters between Brooklyn Borough Hall and the Brooklyn municipal building on Joralemon Street." *See* Am. Compl. ¶¶ 14, 16. Plaintiff alleges that the City of New York, at all relevant times, "was speaking with only message: that only Black Lives Matter." *See* Am. Compl. ¶ 18. Plaintiff alleges that he, "seeking to acknowledge that more than only black lives matter, sought to make a more inclusive mural, recognizing that lives other than black lives matter," *see* Am. Compl. ¶ 19, and "sought permission from the City of New York to place this mural so as to avoid removal of the mural or penalties (from fines to imprisonment) against him and those helping him with the mural," *see* Am. Compl. ¶ 20. Plaintiff alleges that he "was not asking Defendant City of New York to promote, sanction, or otherwise support his message, which message he knew was in direct contradiction of the message which Defendant City of New York had been promoting." *See* Am. Compl. ¶ 21.

A. **July 2020 Correspondence**

Plaintiff alleges that in July 2020, Plaintiff emailed "DiBlasio's office" and asked if he could make a mural. *See* Am. Compl. ¶ 22. In an email dated July 2, 2020, Plaintiff wrote: "I would like to paint a message like Black Lives Matter on the street too. Just like is being done in lower Manhattan. What form do I need to fill out to be allowed to do it?" *See* Def.'s Ex. K.[4] In

---

[4] The Court considers emails dated July 2, 2020, July 13, 2020, July 22, 2020, and August 5, 2020 and an application dated September 8, 2020, *see* Def.'s Exs. K-P, in connection with deciding the instant motion because these documents are incorporated by reference in – and integral to – the Amended Complaint, and because there is no dispute regarding the documents' authenticity, accuracy, or relevance. *See* Pl.'s Br. at 7 n.2 ("Plaintiff takes no issue with the attachment and consideration of various application and response documents discussed in the Amended Complaint. (Defendant's Exhibits K-P)."); *see also* Def.'s Br. at 5-7. The Court need not and does not consider the remaining exhibits submitted with the Murray Declaration.

an email dated July 13, 2020, Plaintiff wrote: "I would like to do a mural or street message similar to the BLM one in the City by Trump Tower. I want to do mine in Brooklyn and a similar one but slightly different. Can I get a permit for it?" *See* Def.'s Ex. L.

By email dated July 22, 2020, Plaintiff received a response from the Customer Service Unit of the New York City Department of Transportation ("NYCDOT") stating in part:

> Thank you for your July 2, 2020 correspondence that you addressed to Mayor de Blasio supporting the Black Lives Matter street murals throughout the city and your suggestion for additional mural locations. Your correspondence was forwarded to the Department of Transportation (DOT) to respond. . . . You are welcome to cheer on and participate in all Black Lives Matter mural events; however, the current mural locations that have been identified and supported by Mayor de Blasio and local elected officials are the only ones authorized at this time. Nevertheless, we appreciate your support and have forwarded your feedback to the DOT operational unit overseeing the mural installations.

*See* Def.'s Ex. N.

Plaintiff alleges that he "also contacted several politicians and agencies within the City of New York and spoke with various staff members who promised that he would hear back on his request," but "[i]n the end, . . . [he] was simply referred from one politician and/or agency to another, without progress on his request." *See* Am. Compl. ¶ 23. Plaintiff alleges that he emailed and called his New York City Council Member but was eventually told to contact NYCDOT. *See* Am. Compl. ¶ 24.

B.  **August 2020 Correspondence**

On August 5, 2020, Plaintiff filed with NYCDOT "for permission to convey his message." *See* Am. Compl. ¶ 25. In an email dated August 5, 2020 to an individual at NYCDOT, Plaintiff wrote:

> I called the Manhattan Borough President's office and was given your e-mail. I would like to get a permit to do a mural similar to the BLM one in City Hall. Same size letters and I can pay for the paint and supplies myself. I have the following locations in mind so please let me know which one of these is acceptable to you?

4

*See* Def.'s Ex. M.  Plaintiff then listed 26 locations, including "1. Vesey St. between Church St. and W Broadway," "2. Ann St. between Nassau street and W Broadway," and "3. Fulton Street between W Broadway and Nassau Street," among others.  *See* Def.'s Ex. M.  Each of the locations was stated with reference to streets.  *See* Def.'s Ex. M.

On August 18, 2020, Plaintiff received a response to his August 5, 2020 application, with the subject line "DOT-467383-H2Y2 – Street Marking/Request – Leonard St between Church St and Broadway – Permit for Mural – Manhattan," stating in part that, "[e]xcept for a one time City initiative to install 'Black Lives Matter' murals on City roadways at certain locations, [NYCDOT] does not permit installations on City roadways that are open to traffic."  *See* Am. Compl. ¶ 26; Def.'s Ex. O.  Plaintiff alleges that this response "demonstrates that Defendant was seeking to categorize Plaintiff's request as just another mural following or copying what the City had done" and "indicate[s] that Defendant City of New York was seeking to label Plaintiff's application as government speech, even though Plaintiff sought to present private speech which contradicted the City's message that only Black Lives Matter."  *See* Am. Compl. ¶ 27.  Plaintiff further alleges that "Defendant, . . . in using the words 'on City roadways that are open to traffic,' limited private messaging on active City streets, but failed to address where private citizens could present their messages within New York City."  *See* Am. Compl. ¶ 28.[5]

C.  **September 8, 2020 Application**

On September 8, 2020, Plaintiff applied again to NYCDOT.  *See* Am. Compl. ¶ 29; Def.'s Ex. P.  In Plaintiff's September 8, 2020 application, in the section titled "Artwork Type,"

---

[5]  The August 18, 2020 response did state: "For more information regarding the process and eligibility requirements for submitting a request to undertake artwork installations in certain public places, please visit NYCDOT's website," and the response provided a link to the website.  *See* Def.'s Ex. O.

5

Plaintiff selected the box for "Mural," and in the section titled "Materials," Plaintiff listed "Paint and brushes." *See* Def.'s Ex. P at 15.  In the section titled "Organizational Background," Plaintiff wrote: "We're private citizens who want all races and ethnicities in our city to be represented by 'lives matter' words painted on the street." *See* Def.'s Ex. P at 16.  In the section titled "Site Selection," Plaintiff wrote: "We are open to any site in the borough of Manhattan that is available, but preferably close to the 'Black Lives Matter' words on the street mural in City Hall." *See* Def.'s Ex. P at 16.  In the section titled "Context," Plaintiff wrote: "'Black Lives Matter' was simple words painted on a street by the mayor and regular people.  This can be done by regular citizens as well and does not require an artistic background." *See* Def.'s Ex. P at 16.  In the section titled "Project Description/Artist Statement," Plaintiff wrote: "The concept is that there are many races and ethnicities living in NYC and it is discriminatory to say that only one's lives matter and ignore all others.  'Black Lives Matter' is a political organization that openly supports radically changing this country's economy and politics and is offensive to many people.  If their message is allowed, than opposing messages must be allowed too." *See* Def.'s Ex. P at 16.  In the section titled "Artist Bio," Plaintiff wrote: "This is our first project and requires simply painting letters on the street and no artistic knowledge." *See* Def.'s Ex. P at 16.  In the section titled "Project Schedule," next to "Display Period," Plaintiff wrote: "As long as the BLM signs are allowed" and next to "Removal," Plaintiff wrote: "After the same time as the BLM signs are allowed." *See* Def.'s Ex. P at 17.  In the section titled "Fabrication/Installation," Plaintiff wrote: "We have paint and brushes and will complete all the work out of our own budget.  We will simply paint large 'All Lives Matter' letters on a street of your choosing in the same height and width as for the BLM letters and with the same color paint." *See* Def.'s Ex. P at 17.  In the section titled "Maintenance," Plaintiff wrote: "The same exact maintenance provided

to the BLM signs." *See* Def.'s Ex. P at 17. At the end of the application, Plaintiff included the same list of 26 locations that he had included in his August 5, 2020 email and added: "[o]r any street in the City north to 100'th Street of your choosing." *See* Def.'s Ex. P at 18.

Plaintiff alleges that the form he used on September 8, 2020 stated that a response would be given to the application within two weeks, which would have been September 22, 2020. *See* Am. Compl. ¶ 32. Plaintiff further alleges that, even though he did not receive any response from Defendant, his application was effectively denied when he was not approved at the end of that two-week period. *See* Am. Compl. ¶ 32. Plaintiff alleges that, "to the extent that Defendant City of New York viewed or views the streets of New York City to be spaces wherein it can control the message presented," Defendant "did not provide any alternate venue where Plaintiff could present his independent message, which was contradictory of the government's message." *See* Am. Compl. ¶ 31. Plaintiff further alleges that, accordingly, "Defendant provided Plaintiff with absolutely no means to present his private speech without risk of being shut down and penalized for expressing that private speech." *See* Am. Compl. ¶ 31.

## II. Procedural Background

On December 14, 2021, Plaintiff filed the Complaint. *See* ECF No. 1. On February 6, 2023, Plaintiff filed the Amended Complaint. *See* ECF No. 16. On March 24, 2023, the Court held a pre-motion conference and set a briefing schedule for Defendant's anticipated motion to dismiss. *See* ECF No. 19. On June 9, 2023, Defendant filed the Motion to Dismiss, which Plaintiff opposes. *See* ECF Nos. 24-28.

## DISCUSSION

## I. Standard of Review

To survive dismissal for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must plead "enough facts to state a claim to relief that is

7

plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ. of City Sch. Dist. of N.Y.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Court must "accept all 'well-pleaded factual allegations' in the complaint as true" and "'construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff.'" *Lynch v. City of N.Y.*, 952 F.3d 67, 74-75 (2d Cir. 2020) (first quoting *Iqbal*, 556 U.S. at 679; then quoting *Arar v. Ashcroft*, 585 F.3d 559, 567 (2d Cir. 2009)). However, "labels and conclusions" or "formulaic recitation[s] of the elements of a cause of action will not do," and dismissal is proper where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 555, 558. A court is not "bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." *See Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quotation omitted); *see also Iqbal*, 556 U.S. at 678 (noting that a court is "not bound to accept as true a legal conclusion couched as a factual allegation" (quoting *Twombly*, 550 U.S. at 555)); *Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010) (noting that "factual allegations must be sufficient to support necessary legal conclusions"). "In considering a motion to dismiss for failure to state a claim, '[a] district court is normally required to look only to the allegations on the face of the complaint,'" though "[it] may consider documents that 'are attached to the complaint,' 'incorporated in it by reference,' 'integral' to the complaint, or the proper subject of judicial notice." *United States v. Strock*, 982 F.3d 51, 63 (2d Cir. 2020) (quoting *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)).

8

## II.     Plaintiff's First Amendment Claim is Dismissed

In his First Cause of Action, Plaintiff alleges that Defendant, acting under the color of law, has deprived and continues to deprive Plaintiff of his rights guaranteed by the First Amendment, in violation of 42 U.S.C. § 1983 ("Section 1983").  *See* Am. Compl. ¶ 37.[6] Specifically, Plaintiff alleges that Defendant has violated Plaintiff's First Amendment rights by denying Plaintiff the opportunity and/or permission to use space within the City of New York, at an appropriate time and place, to present his requested message, because of the content of that requested message; by failing to provide a reasonable basis, or any basis, for denying Plaintiff the opportunity to express his requested message within the City of New York; by favoring the viewpoint of Black Lives Matter over other viewpoints which Plaintiff has sought to present; and by effectively censoring the private speech which Plaintiff seeks to present by forbidding Plaintiff's message from being presented, in any manner or location, in New York City.  *See* Am. Compl. ¶ 38.

For the reasons that follow, Plaintiff's First Amendment claim is dismissed for failure to state a claim.

### A.     Applicable Law

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'"  *Reed v. Town of Gilbert,*

---

[6] Section 1983 "provides 'a method for vindicating federal rights elsewhere conferred,' including under the Constitution."  *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).  To sustain a claim brought under Section 1983, "[t]he conduct at issue 'must have been committed by a person acting under color of state law' and 'must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.'"  *Id.* (quoting *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994)).

9

*Ariz.*, 576 U.S. 155, 163 (2015) (quoting U.S. Const. amend. I).[7] In general, "a government, including a municipal government vested with state authority, 'has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Id.* (quoting *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)). "However, if a government 'engag[es] in [its] own expressive conduct, then the Free Speech Clause has no application' because, while the First Amendment 'restricts government regulation of *private* speech,' it does not restrict the *government's* speech." *Women for Am. First v. Adams* ("*WFAF*"), No. 21-485-CV, 2022 WL 1714896, at *2 (2d Cir. May 27, 2022) (emphasis and alterations in original) (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009)); *see also Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015). "Thus, when the government speaks for itself, 'it is not barred by the Free Speech Clause from determining the content of what it says,' and 'is entitled to favor certain views over others.'" *WFAF*, 2022 WL 1714896, at *2 (first quoting *Walker*, 576 U.S. at 207; then quoting *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 34 (2d Cir. 2018)).

"To determine whether contested speech is government or private, the Supreme Court has identified three primary factors: (1) whether the medium has historically been used to 'communicate messages from the States'; (2) whether the medium is 'often closely identified in the public mind with the State,' *i.e.*, whether it is reasonably interpreted as 'conveying some message on the government's behalf'; and (3) whether the government maintains direct, editorial control over the message's content." *Id.* (alterations accepted) (quoting *Walker*, 576 U.S. at 210-

---

[7] The First Amendment provides, in relevant part: "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.

10

13, 219).[8]

In *Summum*, for example, the Supreme Court concluded that monuments placed in a city's public park represented government speech, noting that "[g]overnments have long used monuments to speak to the public," "persons who observe donated monuments routinely – and reasonably – interpret them as conveying some message on the property owner's behalf," and the city government "effectively controlled the messages sent by the monuments in the Park by exercising final approval authority over their selection."  *See* 555 U.S. at 470-73 (quotations omitted).  Similarly, in *Walker*, the Supreme Court concluded that Texas's specialty license plates convey government speech, noting that "the history of license plates shows that . . . they long have communicated messages from the States," "Texas license plate designs are often closely identified in the public mind with the [State]," and "Texas maintains direct control over the messages conveyed on its specialty plates" by exercising "final approval authority."  *See* 576 U.S. at 209-13 (alteration in original) (quotations omitted).

### B.   Plaintiff Fails to State a First Amendment Claim

Defendant argues that Plaintiff's submissions to the City unequivocally identify the street as the proposed location for his mural; that the decisions to allow the Black Lives Matter murals to be painted on New York City streets and not to allow Plaintiff to paint his message on a New York City street constitute government speech, which is not subject to First Amendment scrutiny, and do not give rise to a First Amendment claim; and that Plaintiff's claim that the City violated his First Amendment rights fails as a matter of law.  *See* Def.'s Br. at 2-8.  In support of its motion, Defendant relies on *WFAF*, a materially factually similar case – discussed in greater detail below – in which the United States Court of Appeals for the Second Circuit concluded that

---

[8]   The Court refers herein to these three factors as the "*Walker* factors."

11

the City's acceptance, creation, and preservation of the Black Lives Matter murals as well as the denial of the *WFAF* plaintiff's application to paint its own mural were an exercise of government speech. *See* Def.'s Br. at 3-5, 7-8. Defendant argues that Plaintiff's allegations do not present circumstances on which to distinguish *WFAF* or otherwise avoid dismissal of Plaintiff's First Amendment claim under the government speech doctrine. *See* Def.'s Br. at 5.

In opposing Defendant's motion, Plaintiff argues that the message Plaintiff sought to present is not government speech and argues, more specifically, that "the second prong of the *Walker* test fails" and that this case is distinguishable from *WFAF* and from *Summum*. *See* Pl.'s Br. at 8-12. Plaintiff argues that the instant case is distinguishable from *WFAF* because Plaintiff's proposed message that "All Lives Matter" clearly opposed and contradicted Defendant's message that "Black Lives Matter" and no reasonable person would assume that Defendant endorsed Plaintiff's message, whereas the plaintiff in *WFAF* "apparently sought to add to the message being conveyed by the City of New York." *See* Pl.'s Br. at 11-12. Plaintiff argues that the instant case is distinguishable from *Summum* because, given the "extremely contradictory message" that Plaintiff seeks to convey, there is no reason to believe that Defendant would have selected Plaintiff's message to display and/or taken ownership of that message, as the city did in *Summum* with respect to the monuments at issue there. *See* Pl.'s Br. at 10.

In reply, Defendant contends that Plaintiff's argument – that Plaintiff's proposed message is private speech based on the content of the message – ignores the very premise of the government speech doctrine as well as what constitutes government speech under well-established Supreme Court precedent. *See* Def.'s Reply at 1. Defendant emphasizes that Supreme Court and Second Circuit caselaw makes clear that circumstances other than the

12

content of the proposed speech determine whether the speech is government speech. *See* Def.'s Reply at 4-7.

As an initial matter, Plaintiff's requests, considered individually or collectively, reflect that Plaintiff was seeking to paint a mural *on the street*. Notwithstanding Plaintiff's assertion that his requests became "increasingly broad," *see* Pl.'s Br. at 8, the nature and scope of Plaintiff's requests are clear from the relevant documents themselves. In his July 2, 2020 email, Plaintiff stated that he wanted "to paint a message like Black Lives Matter on the street too," *see* Def.'s Ex. K; in his July 13, 2020 email, Plaintiff stated that he wanted "to do a mural or street message similar to the BLM one," *see* Def.'s Ex. L; in his August 5, 2020 email, Plaintiff stated that he sought "a permit to do a mural similar to the BLM one" and Plaintiff listed 26 locations, with reference to street names, *see* Def.'s Ex. M; and in his September 8, 2020 application, Plaintiff indicated that he wanted "all races and ethnicities in our city to be represented by 'lives matter' words painted on the street," noted that "'Black Lives Matter' was simple words painted on a street" and that Plaintiff's proposed project "requires simply painting letters on the street," described the installation process as "[w]e will simply paint large 'All Lives Matter' letters on a street of your choosing in the same height and width as for the BLM letters and with the same color paint," and again proposed a list of 26 locations, referencing particular street names and adding: "[o]r any street in the City north to 110'th Street of your choosing," *see* Def.'s Ex. P.[9]

---

[9] The Amended Complaint alleges that, in his September 8, 2020 application, Plaintiff "stated that he would be happy to present his message in any location within Manhattan and did not confine the proposed location to the actual street." *See* Am. Compl. ¶ 30. Although in the section of his September 8, 2020 application titled "Site Selection" Plaintiff wrote: "[w]e are open to any site in the borough of Manhattan that is available," *see* Def.'s Ex. P at 16, Plaintiff's September 8, 2020 application makes clear that the project itself was to be, like the Black Lives Matter street murals, "words painted *on the street*." *See* Def.'s Ex. P at 16; *see also* Def.'s Ex. P at 17 (referencing "letters on a street of your choosing in the same height and width as for the BLM letters and with the same color paint" and noting that Plaintiff's

Here, as in *WFAF*, the Black Lives Matter murals and Defendant's denial of Plaintiff's requests to paint his own street mural constituted the exercise of government speech. *See WFAF*, 2022 WL 1714896, at *2, 4.

At issue in *WFAF* was the request of Women for America First ("WFAF") to then-Mayor de Blasio to paint a mural of WFAF's motto – "Engaging, Inspiring and Empowering Women to Make a Difference!" – "on Fifth Avenue, or another similar street within the city's jurisdiction," which request ultimately was denied by NYCDOT. *See id.* at *1 & n.3. WFAF brought suit against former Mayor de Blasio and the former New York City Transportation Commissioner, in their official capacities, alleging, *inter alia*, that their denial of WFAF's request to paint a mural similar to New York City's Black Lives Matter murals deprived WFAF of its First Amendment rights in violation of Section 1983. *See id.* at *1.

The Second Circuit applied the *Walker* factors to WFAF's allegations. First, the Second Circuit noted that "New York City has historically used this medium – *i.e.*, markings upon roadways – as a means to communicate with the public." *See id.* at *2. Second, the Second Circuit noted that, "because of this historical communicative use, City streets are 'closely identified in the public mind with the government unit that owns [them].'" *See id.* at *3 (alteration in original) (quoting *Summum*, 555 U.S. at 472). Third, the Second Circuit noted that the City "clearly exercised control" over the content of the Black Lives Matter murals because the City "'took ownership' of the Murals and displayed them on streets 'that it owns and manages and that [are] linked to the City's identity.'" *See id.* (alteration in original) (quoting *Summum*, 555 U.S. at 473-74). Accordingly, the Second Circuit "conclude[d] that the City

---

project would entail "[t]he exact same maintenance provided to the BLM signs"). The Court need not assess Plaintiff's credibility here, *see* Pl.'s Br. at 8, and the Court does not do so.

14

Defendants' acceptance, creation, and preservation of the [Black Lives Matter] Murals – as well as their denial of WFAF's application to paint its own – were a prototypical exercise of government speech" and that "the district court correctly held that WFAF's amended complaint failed to plausibly allege a First Amendment claim." *Id.* at *2, 4.

In attempting to distinguish his case from *Summum* and from *WFAF* and in arguing that the second *Walker* factor is not met here, Plaintiff emphasizes the *content* of his message. Such emphasis is, however, misplaced. It is the *medium* that Plaintiff sought to use to present his message that is relevant to the government speech determination here. *See WFAF*, 2022 WL 1714896, at *2 (describing the second *Walker* factor as "whether the *medium* is often closely identified in the public mind with the State") (emphasis added) (quotation omitted)); *Walker*, 576 U.S. at 210-13 (addressing medium of state specialty license plates); *Summum*, 555 U.S. at 470-73 (addressing medium of monuments in a city's public park).

Notwithstanding Plaintiff's arguments to the contrary, the instant case is not materially distinguishable from *WFAF*. Upon application of the *Walker* factors, the Court concludes that Defendant's denial of Plaintiff's request to paint his own *street mural*, like the denial of WFAF's request to paint its own *street mural*, was an exercise of government speech and Plaintiff's Amended Complaint therefore fails to state a First Amendment claim. *See WFAF*, 2022 WL 1714896, at *2, 4.

Plaintiff's First Amendment claim is dismissed.[10]

### III. The Court Declines to Exercise Supplemental Jurisdiction Over Plaintiff's State Law Claim

In his Second Cause of Action, Plaintiff alleges that Defendant has violated Article I,

---

[10] Plaintiff has not alleged any other deprivation of rights under the Constitution or laws of the United States that might support a claim under Section 1983.

Section 8 of the New York State Constitution by denying Plaintiff the ability to present his sentiments on Black Lives Matter, where Plaintiff's viewpoint conflicts with Defendant's sentiments thereon.  *See* Am. Compl. ¶ 41.

Title 28, United States Code, Section 1367(a) provides, as relevant here, that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  District courts may, however, decline to exercise supplemental jurisdiction over such other claims if "the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  "Courts 'consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise' supplemental jurisdiction."  *Lundy v. Cath. Health Sys. of Long Island Inc.*, 711 F.3d 106, 117-18 (2d Cir. 2013) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).  The Supreme Court has recognized that, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Cohill*, 484 U.S. at 350 n.7.

Here, in light of the dismissal of Plaintiff's First Amendment claim, principles of judicial economy and comity counsel heavily in favor of declining to retain jurisdiction over Plaintiff's state law claim.  Indeed, the parties agree that, in the event that the Court dismisses Plaintiff's First Amendment claim, the Court should decline to exercise supplemental jurisdiction over Plaintiff's state law claim.  *See* Def.'s Br. at 8-9; Pl.'s Br. at 13-14; Def.'s Reply at 2.  The Court declines to exercise supplemental jurisdiction over Plaintiff's state law claim.

16

Plaintiff's state law claim is dismissed without prejudice.

## CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss, ECF No. 24, is GRANTED and the Amended Complaint, ECF No. 16, is dismissed.[11]  Dismissal of Plaintiff's state law claim is without prejudice.

The Clerk of Court is directed to enter judgment accordingly and to close the case.

SO ORDERED.

                                                      */s/ Diane Gujarati*
                                                     DIANE GUJARATI
                                                     United States District Judge

Dated: February 5, 2024
       Brooklyn, New York

---

[11] In light of the applicable legal standards governing the instant motion, Plaintiff's suggestion that the Court "could easily deny this motion to dismiss, allow for discovery, and address the legal issues again if a summary judgment motion is made," *see* Pl.'s Br. at 13, is unavailing.